Filed 4/17/13  In re Dario M. CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FIFTH APPELLATE DISTRICT**

| | |
|---|---|
| In re DARIO M., et al., Persons Coming Under the Juvenile Court Law. | |
| TULARE COUNTY HEALTH AND HUMAN SERVICES AGENCY,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>CYNTHIA M.,<br><br>Defendant and Appellant. | F065465<br><br>(Super. Ct. No. JJV063289)<br><br>**OPINION** |

**THE COURT**\*

APPEAL from an order of the Superior Court of Tulare County.  Jennifer Shirk, Judge.

Mary R. Williams, under appointment by the Court of Appeal, for Defendant and Appellant.

---

\* Before Levy, Acting P.J., Cornell, J. and Gomes, J.

Kathleen Bales-Lange, County Counsel, John A. Rozum, and Amy-Marie Costa, Deputy County Counsel, for Plaintiff and Respondent.

-ooOoo-

Cynthia M. (mother) appeals from an order terminating parental rights to her five children. (Welf. & Inst. Code, § 366.26.)[1] Mother contends the juvenile court's finding that the children were likely to be adopted was not supported by substantial evidence. We disagree and affirm the court's order.

## FACTUAL AND PROCEDURAL HISTORIES

*The First Dependency Case*

Dependency jurisdiction first was taken over mother's oldest four children, then seven-year-old Dario, three-year-old Angelica, two-year-old Daniel, and 18-month-old Julissa, in 2008. The Tulare County Health and Human Services Agency (Agency) filed a juvenile dependency petition in September of that year, after police were called when mother's neighbor saw Daniel wandering in the street wearing only a very soiled diaper. The responding officer found two other children, Angelica and Julissa, walking down the middle of the road; Angelica was wearing only panties, while Julissa was wearing only a soiled diaper. Mother eventually came out of the home and said the children were hers. The officer, who recognized mother from previous arrests for being under the influence of methamphetamine, believed mother was under the influence.

Mother and the children were living in the paternal grandparents' garage. The children's father, Dario A. (father), left them the month before. Mother told the social worker she began using methamphetamine at the age of 13 and she wanted help for her substance abuse problem. Dario reported that when he was in trouble he was hit a lot with an open hand. He also described domestic violence between his parents, and stated that both mother and father slept during the day.

---

[1] All statutory references are to the Welfare and Institutions Code.

2.

The juvenile court found true the petition's allegations that both parents non-accidentally inflicted serious physical harm on Dario, which placed the other children at risk of harm (§ 300, subd. (a)), and mother and father failed to protect the children and their substance abuse placed the children at risk (§ 300, subd. (b)). The children were removed from their parents' custody and placed together in a foster home. Dario and Angelica were assessed for mental health services; Dario was diagnosed with adjustment disorder with mixed anxiety and depressed mood, while Angelica was diagnosed with adjustment disorder with mixed disturbance of emotions and conduct. They began receiving therapy.

At the March 2009 review hearing, the juvenile court terminated father's services, continued mother's services, and kept the children in out-of-home placement. In June 2009, the Agency returned the children to mother's care and custody; the juvenile court ordered the children returned to mother on family maintenance in September 2009. The next month, mother gave birth to her fifth child, Andrew, whose father is also Dario A.

Mother received family maintenance services until April 2011, when the juvenile court granted mother custody of the children and terminated dependency jurisdiction. At each family maintenance review, the social worker reported the children were happy, well-adjusted, doing fine in mother's care, enjoyed playing with each other, and did not have significant medical or emotional/behavioral problems, except for a need to follow-up on dental work that began while they were in foster care. Mother had difficulty getting Dario to school on time, and ensuring that Dario and Angelica attended their therapy appointments.

By the February 2011 review hearing, when the Agency recommended dismissal of dependency, Dario was to be discharged from therapy in March, as he was doing well and did not need continuous services. Angelica was discharged from therapy after being reassessed for mental health services in November 2010, as services were not medically necessary; Angelica was doing well and was no longer aggressive.

The February review hearing was continued because mother, who had been living with her boyfriend and the children at his parents' house, unexpectedly had to move. The family moved to the maternal grandmother's home, which was too small for all of them. Mother said the move was temporary, as she and her boyfriend were looking for a place to live. The court ordered that four-year-old Daniel be referred to the Central Valley Regional Center (CVRC) for evaluation, as he was not talking much and did not like to be touched or hugged.

By April 2011, mother and her boyfriend were still living with the maternal grandmother and looking for housing. The Agency continued to recommend dismissal. On April 26, 2011, the juvenile court granted mother sole legal and physical custody of the children, and terminated dependency jurisdiction.

*The Current Dependency Case*

Less than a month later, on May 20, 2011, mother was arrested for child endangerment and being under the influence of a controlled substance. She left all five children at home without adult supervision for about 30 minutes while she went to purchase methamphetamine. When the maternal grandmother, Flora M., came home, she found the children alone. To teach mother a lesson, Flora left the house with the children. When mother returned home, the children were missing. Mother called the police. Flora returned with the children after the responding officer called her. Mother tested positive for methamphetamine.

On May 24, 2011, a juvenile dependency petition was filed alleging that mother's substance abuse and failure or inability to supervise or protect the children placed them at substantial risk of harm (§ 300, subd. (b)); the children were left without provision for support, as father's whereabouts were unknown (§ 300, subd. (g)); and the children were at risk of suffering the same abuse or neglect as in the prior dependency case (§ 300, subd. (j)).

4.

The next day, the juvenile court ordered the children detained.  The Agency could not locate a foster home that would take all of the children, so it placed Dario and Daniel together in one foster home, and Angelica, Julissa and Andrew in another.  On June 17, 2011, the social worker moved Angelica, Julissa and Andrew to their maternal great-aunt's home after the foster parent asked that Julissa be removed due to her aggressive behaviors.

A Court Appointed Special Advocate (CASA) appointed for the children visited them in their foster homes.  Dario and Daniel's foster mother reported that the boys were sharing a room.  They played rough with each other; sometimes she worried that Dario was too rough with Daniel.  Nine-year-old Dario was in the fourth grade; he was below basic in reading and writing, and progressing in language conventions and math.  In a written note, his teacher stated he had a long way to go in order to do well, and that many things prevented him from learning, such as immaturity, behavior and effort.  The foster mother suspected both boys had cavities and would need dental treatment.  Five-year-old Daniel had trouble following directions; he had a temper and often would throw tantrums, in which he would throw himself down on the floor.  Daniel was a picky eater and ate very little.  Daniel was difficult to understand, but he talked more than when the CASA previously saw him while he was in mother's custody.  Daniel did well on the "Social Emotional ASQ," but struggled on the fine motor and problem solving skills of the "Developmental ASQ."

The CASA saw six-year-old Angelica, four-year-old Julissa and one-year-old Andrew in their first foster home.  Angelica, who was in kindergarten, was protective of her siblings and usually well behaved.  Angelica and Julissa shared a room, but the foster mother often found them sleeping in the same bed.  Julissa would cry when hungry instead of asking for food.  She did well on the "Developmental and Social Emotional ASQ."  The foster mother reported that Julissa was aggressive with Angelica, who would hit her back, but the girls were not aggressive with Andrew or the foster mother's

daughter. Julissa was quiet, did not like to share, and rarely laughed. The foster mother was concerned about Julissa's tantrums, in which Julissa could scream up to 20 minutes and throw anything she could grab, as the tantrums were negatively impacting the foster mother's daughter. Andrew was a good baby, who was generally quiet and rarely got upset. He could not feed himself, so the foster mother would feed him. The CASA recommended a concurrent plan of adoption as a sibling group should mother fail to reunify.

In a jurisdiction/disposition report filed on June 29, 2011, the Agency recommended that (1) the children be declared dependents of the court, (2) mother not be offered reunification services pursuant to section 361.5, subdivision (b)(13),[2] (3) father not be offered reunification services pursuant to section 361.5, subdivision (b)(10),[3] and (4) a section 366.26 hearing be calendared within 120 days to determine a permanent plan for the children.

The report described the children's current status. At the time of detention, all of the children were upset and crying at the thought of being removed from their home. Dario, Angelica and Julissa were not CVRC clients, did not exhibit behaviors that would warrant a CVRC referral, and appeared to be meeting developmental milestones. Julissa could walk, talk, verbally express her wants and needs, and communicate her feelings.

---

[2] Section 361.5, subdivision (b)(13), authorizes a juvenile court to deny a parent reunification services when it finds, by clear and convincing evidence, that the parent has a history of extensive, abusive, and chronic use of drugs or alcohol and has resisted prior court-ordered treatment for this problem during a three-year period immediately prior to the filing of the petition that brought the child to the court's attention.

[3] Section 361.5, subdivision (b)(10) authorizes a juvenile court to deny reunification services when it finds, by clear and convincing evidence, that the juvenile court ordered termination of reunification services for a sibling because the parent failed to reunify with the sibling, and the parent has not subsequently made a reasonable effort to treat the problems that led to removal of the sibling from that parent.

While Andrew was not a CVRC client and the great-aunt did not believe he needed a referral, an Agency nurse arranged to have him assessed to determine whether a referral was needed. Mother had not followed through with the CVRC referral for Daniel, so the social worker rescheduled an intake appointment. While in mother's care, Dario moved schools twice. During the 2009-2010 school year, Dario frequently missed or was late to school, his grades suffered and he had difficulty completing assignments.

Dario, Angelica, Daniel and Julissa were being evaluated for mental health counseling. Andrew was too young for mental health intervention and did not exhibit behaviors warranting therapeutic intervention. The great-aunt reported that Angelica was extremely quiet and withdrawn, while Julissa was exhibiting behaviors beyond her control, such as being aggressive, hitting, biting, screaming, breaking things, and not following directions. It appeared to the social worker that Julissa was having a difficult time adjusting and coping. Andrew was adjusting well to the great-aunt's home and she was not experiencing any major issues with him. Dario and Daniel enjoyed their foster home and, with the exception of sibling rivalry, appeared to be doing well.

The social worker had not found a home that was willing or able to take all five children. The social worker had not been successful in her efforts to find a relative willing to take Dario and Daniel. The Agency wanted to find relatives for them so the five children could be connected even if they did not live together in one home.

An adoptions assessment for all five children was completed on June 29, 2011. The assessment deemed the children adoptable, but since this was a sibling set and the children were not placed together, the Agency wanted to continue to seek other relatives to take Dario and Daniel to allow ongoing contact with the other three siblings. If other relatives could not be located, the Agency would try to locate a non-relative adoptive family who would be open to ongoing sibling contact. The great-aunt was willing to adopt the three siblings in her care. She was also willing to take Dario and Daniel, but she did not have room for them in her home.

A jurisdictional hearing was held on July 12, 2011. After mother submitted on the social worker's reports, the juvenile court found the petition's allegations true and set a contested dispositional hearing. At the August 17, 2011 dispositional hearing, the juvenile court found section 361.5, subdivision (b)(13) applied to mother, section 361.5, subdivision (b)(10) applied to father, and denied them both reunification services. A section 366.26 hearing was set for December 9, 2011.

The Agency filed a section 366.26 report on December 1, 2011, which recommended adoption with termination of parental rights. The children were in the same placements. Dario was in the fifth grade, enjoyed school and was participating in an afterschool program that helped him complete his homework. He was getting a C- in language conventions, a D+ in math, a C+ in reading, and an A- in spelling.

Dario was participating in counseling services with therapist Noushafarin Tabatabi. He was diagnosed with adjustment disorder, unspecified. When first assessed in May 2011, the foster mother reported Dario had temper tantrums, nightmares, and difficulty following redirection, and bit his nails. He and Daniel argued often. The foster mother also reported Dario demonstrated highly competitive behaviors with his siblings, which often resulted in sibling arguments and caused Dario to act aggressively towards them. He refused to take responsibility for his part in sibling conflicts. Dario sometimes acted out in public settings, such as arguing with siblings or acting impulsively, where it was difficult to redirect him. Dario's self-soothing and anxious behaviors had decreased. During therapy, Dario expressed concern about whether he would live with mother in the future. Tabatabi believed Dario might take on the roll of a "surrogate" spouse, which is a typical parent-child dynamic when substance abuse issues are present in the home, and that he would continue to take on an adult role with his siblings. Tabatabi reported Dario was making some progress toward reaching the overall therapeutic goals and would benefit from ongoing mental health services to help him continue to work toward engaging positively with his siblings, responding to redirection by adults, and increasing

his insight regarding how his controlling behaviors may be attributed to mother's substance abuse and overall neglect.

Angelica, who was in the first grade, was also in the afterschool program that helped her complete her homework. She enjoyed school and was doing well there without any concerns. Angelica was participating in counseling services; her therapist was Michelle Forsyth. She had been diagnosed with adjustment order, unspecified, but as treatment progressed, Forsyth saw Angelica demonstrate many symptoms and behaviors consistent with reactive attachment disorder of infancy or early childhood (RAD). The great-aunt was participating in family and collateral parenting support sessions, while Angelica was attending weekly individual therapy, as well as a weekly school based social skills group. Angelica was beginning to identify and verbalize her feelings related to the previous home situation. Angelica's defiant behaviors toward the great-aunt and aggression toward a same aged peer in the home had increased some. Angelica struggled to accept responsibility for her actions and often blamed others. The great-aunt was learning and implementing RAD parenting techniques; it was important for Angelica to remain in a structured environment where she would receive supervision, consistency and affection, and to begin to learn to reattach and bond with caregivers.

Daniel completed his CVRC assessment on September 26, 2011, but the results were still pending. He was in kindergarten and participated in an afterschool program. He recently was awarded a certificate "for always doing his best." He was participating in counseling services with therapist Noushafarin Tabatabi. He was diagnosed with adjustment disorder, nonspecified. Daniel continued to struggle with speech articulation. He had little difficulty adjusting to starting school and was progressing academically. His anxious reactions to new settings were decreasing. The foster parent reported Daniel was able to verbalize his needs, and was more compliant to redirection when away from Dario. He continued to exhibit self-soothing behaviors that appeared to be anxiety based. Tabatabi noted Daniel was demonstrating an increased level of functioning at his foster

home and a decreased level of anxiety in new settings. Tabatabi opined that continued mental health services would allow Daniel to work toward the development of appropriate social skills, decrease anxiety symptoms and increase the ability to sustain attention for a significant amount of time.

Julissa was participating in counseling services with Michelle Forsyth. She was diagnosed with RAD and physical abuse. Julissa had made progress in decreasing the duration and severity of her tantrums as a direct result of the great-aunt's consistent efforts and modeling of acceptable behavior. Julissa struggled to comply with directives without arguing. During therapy sessions, she struggled to respect personal boundaries and limits set in session, and was defiant when redirected. She was responsive to her great-aunt during therapy sessions and appeared to seek out affirmation. With consistency in the home environment and RAD parenting, Forsyth was hopeful Julissa would continue to decrease her negative behaviors and increase compliance, eventually securing attachment to a primary caregiver. Forsyth opined that, due to the severity of the reported abuse and intensity of Julissa's symptoms and behaviors, it was important for her to continue in therapy, with an emphasis on the care provider's parenting techniques. Forsyth further opined it was important for Julissa to live in a structured environment where she could receive supervision, consistency and affection, and begin to learn to reattach and bond with caregivers.

The great-aunt had been identified as a prospective adoptive parent for Angelica, Julissa and Andrew. The great-aunt had seen mother struggle with her past addictions and wanted to provide stability for the three children, who she loved and was willing to adopt. She was capable of meeting their needs, as she had successfully cared for them since June 2011.

The social worker explained that the children were deemed adoptable, as they were healthy and happy, with no significant medical or developmental problems. The Agency identified adoption as the best permanent plan for the sibling group. The social

worker opined that given the children's characteristics, including their ages, mental health status, and general good health, there were many foster-adopt families who would be willing to adopt the children aside from the current prospective adoptive parent. The social worker further opined adoption was likely. The Agency, however, had not found a home that was willing to take all five children. The social worker believed removing Angelica, Julissa and Andrew from their current placement would be detrimental, as they had transitioned comfortably to the placement and begun to form a bond with the maternal great-aunt. The Agency wanted to find an adoptive home willing to take Dario and Daniel that would be open to sibling contact.

In a report filed on December 7, 2011, the CASA reported the results of assessments of the children in their placements. The foster mother of Dario and Daniel stated that therapy had helped to reduce the acting out and aggression Dario exhibited toward Daniel, and Dario was doing much better. The CASA observed positive interactions between the two boys. Daniel was well-behaved. The CASA observed that Daniel did not make much eye contact and his speech was somewhat unclear. Therapy had reduced his anxious behaviors. He scored well on his social-emotional "ASQ," and was well on track to meeting his developmental milestones. Dario was wearing glasses and appeared well-behaved as he shared toys with Daniel.

Andrew had been diagnosed with a heart murmur, but according to the great-aunt, the doctor said it was not serious. She, however, was concerned about Andrew, as it was hard to get his attention, he stuffed food in his mouth until he gagged, and put non-food items in his mouth even after eating. The great-aunt also reported Andrew had trouble sleeping at night and often rocked back and forth while sitting on the couch. Andrew scored far above the cutoff score for his social-emotional "ASQ," which was a concern, and scored low on the communication portion of the developmental "ASQ," although he scored very well on the remaining sections. Four-year-old Julissa was not enrolled in school at her therapist's recommendation because she was deemed to be a threat to others

11.

and to society. The great-aunt had observed slight improvement with Julissa's tantrums, which were less frequent and intense, but she still became aggressive when she got mad. Julissa's score on her social-emotional ASQ was two times the cutoff score, which was a concern, and was mostly inattentive during the developmental ASQ. She scored low on most sections, with the exception of the problem solving section, in which she scored well. The great-aunt was willing to adopt all of the children, including Dario and Daniel. The foster mother was not sure if they would be willing to adopt.

On December 7, 2011, mother filed a request to change the juvenile court's order from denying her reunification services to granting her services. (§ 388.) The juvenile court denied the request without a hearing, as the request did not state new evidence or a change of circumstances.

On January 5, 2012,[4] the juvenile court held a contested section 366.26 hearing. The Agency submitted on its reports and the juvenile court took judicial notice of the case file. Mother testified that the children had always resided together as a sibling group, they played together during visits, and Julissa, Andrew and Daniel were very close and had a bond with each other. Mother testified the children had special bonds with each other, but Daniel and Julissa's bond was deeper because they are so close in age. Dario had a very deep bond with his siblings.

County counsel asked the juvenile court to find the children adoptable despite their behavior problems and terminate parental rights. The attorney for Angelica, Julissa, and Andrew, also argued for termination of parental rights. The attorney for Dario and Daniel argued adoption at that time was not appropriate because the children were strongly bonded to each other, and asked the juvenile court to apply the sibling exception to termination of parental rights. Mother's attorney argued that parental rights should not

---

[4] Subsequent references to dates are to dates in 2012.

12.

be terminated because of mother's relationship with the children and because the sibling exception applied.

The juvenile court found that mother had not met her burden of establishing the parent/child relationship exception to termination of parental rights applied. The juvenile court asked the parties to consider the application of section 366.26, subdivision (c)(3), which allows the court to identify adoption as the permanent placement goal without terminating parental rights and order the Agency to make efforts to locate an appropriate adoptive family within a maximum of 180 days, where (1) termination of parental rights would not be detrimental to the children, and (2) the children have a probability for adoption, but were difficult to place for adoption because there was no identified or available prospective adoptive parent due to the children's membership in a sibling group. The parties all submitted on that issue. In explaining that the permanent plan goal would be adoption, the juvenile court stated it was finding at that time that the sibling exception to termination of parental rights contained in section 366.26, subdivision (c)(1)(B)(v) was applicable, as that section would not preclude adoption if an adoptive placement could be found for all of the children.

The juvenile court thereafter specifically found that termination of parental rights would not be detrimental to the children, and the children had a probability for adoption but were difficult to place due to the sibling relationship. The court continued the matter for 180 days and ordered that efforts be made to locate an appropriate adoptive family. The court ordered that if a placement were found that could accommodate all five children, the children's attorneys must be notified before any move. The court also stated it was not precluding the possibility of the children being placed in separate adoptive families as long as the adoptive placements included essentially open adoptions that would allow for continued sibling contact.

On May 29, the Agency filed a section 366.26 report, in which it recommended termination of parental rights and adoption for the children. The report contained updates

13.

on the children. They were deemed adoptable. The children presented as healthy and happy, with no significant medical or developmental problems. Daniel's CVRC evaluation had been received; he did not meet the criteria to receive CVRC services. He was referred to speech therapy at school. He received the student of the month award in March, for having a perfect score on addition and subtraction.

The social worker opined that adoption was the best permanent plan and given the children's characteristics, including their age, mental health status, and general good health, there were foster-adopt families willing to adopt them. The Agency had found an adoptive home for all the children together. The prospective adoptive parents were willing and able to adopt all of the children. On May 4, Julissa and Andrew were placed with the prospective adoptive parents. The Agency was waiting until the three older children, Dario, Angelica and Daniel completed their school years before placing them with the prospective adoptive parents. The prospective adoptive parents were a married couple in their early 30's, who had always wanted children of their own but had not been successful in having any, and adopting the children provided a perfect opportunity for them to have the big family they desired. They met the children for the first time on April 5, and transitional visits began thereafter. The prospective adoptive parents were committed to the children and to a plan of adoption.

Dario and Daniel's therapist, Tabatabi, reported on their progress in therapy as of May. Dario appeared to be decompensating in his overall functioning; he had become increasingly antagonistic toward Daniel, refused to take responsibility for his choices and blamed others for his negative choices. He recently required crisis intervention services as he made comments of being unhappy and "wanting to jump out of [a] car." Tabatabi believed the symptoms were a possible reaction to ongoing visits with the prospective adoptive parents. While Dario "liked" the visits, he was exhibiting ambivalence and anxiety-based symptoms as visits with mother were decreasing concurrently. Tabatabi assumed Dario had come to a conclusion regarding his future placement, and noted that

as Dario had not been informed of any pending placement changes, he had begun to retreat from his current placement by engaging in defiant and oppositional behaviors. In contrast, Daniel had demonstrated areas of significant progress, as his level of antagonistic and defiant behaviors and symptoms had decreased overall. Tabatabi reported that Daniel had formed a stable and consistent bond with his current caregiver. Tabatabi cautioned that Daniel's behaviors may increase as placement progresses and he transitions from his current, secured attachment. Tabatabi wanted to be included in planning a time to meet with Dario and Daniel, and their social worker, to discuss placement, and stated he would continue to assess and monitor any ongoing and new suicidal ideations Dario might have.

In a report filed on June 7, the CASA reported that Julissa and Andrew remained placed in the prospective adoptive home, while Angelica was with the great-aunt, and Dario and Daniel remained in their foster home. Dario, Angelica and Daniel were visiting the prospective adoptive parents on the weekends. The CASA completed an assessment at the prospective adoptive home where Julissa and Andrew were placed.

Dario's prospective adoptive father told the CASA that when Dario was in their home on weekends, he tended to be aggressive with his siblings and often provoked them, particularly Daniel. The prospective adoptive father believed Dario had a lot of anger; Dario said he missed his family and became very upset and acted out when mother told him he would not be seeing her. Dario did open up to the prospective adoptive parents a few weeks before and told them he wanted to go home; he ended up having a good weekend with his siblings. The prospective adoptive mother reported that Daniel was a humble child, followed directions well, and while he had trouble eating certain foods, he was trying new things. Angelica was reported to be an overall good child; she was timid, liked to draw, and would shut down when upset. Angelica had normal relationships with her siblings. Julissa's behavior had greatly improved since she moved in with the prospective adoptive parents; she had not engaged in any behaviors previously

reported, such as throwing tantrums, having outbursts, and having inappropriate interactions with males. Julissa scored well in the developmental and social/emotional ASQ. The prospective adoptive parents were told that Andrew's heart murmur was closing up. While Andrew had a temper and could be stubborn, he was generally a sweet and funny child. He had become used to timeouts and did not scratch himself. Andrew interacted appropriately with his siblings.

The CASA further reported that while scheduling the assessment, the prospective adoptive mother stated they might not be able to adopt the children after all, as her husband was going through a career change. They were in the process of informing the social worker about this. Their "major concern" was in regards to Dario, who had been aggressive and upset due to not being able to go back home. The four oldest children were demonstrating better behavior in the home. The CASA further reported that Angelica was excelling in school, reading above grade level and had no discipline record. Dario was reading at grade level and progressing in all of his subjects.

In an addendum report filed on June 8, the Agency changed its recommendation from adoption to a permanent planned living arrangement (PPLA) with the goal of reunifying the siblings. The Agency reported that on June 5, the prospective adoptive parents informed the social worker they would not be able to continue with the adoption due to personal issues, namely that they were moving back east, and they were devastated about the current situation. The children's therapists were informed of this information that same day.

On June 7, Julissa and Andrew were returned to their great-aunt's care, where Angelica remained placed. Dario's foster mother called the social worker that day and said that, while cleaning Dario's room, she found "various pornographic material." She was highly concerned. The social worker relayed this information to Dario's therapist, who told the social worker Dario was having emotional difficulties. The therapist related that on one occasion, when a visit with the prospective adoptive parents was cancelled,

16.

Dario was very distraught and made comments during therapy that he wanted to jump out of the car. A crisis team evaluated him and he appeared to be fine. The social worker was highly concerned about the children's emotional wellbeing and therefore recommended the children receive psychiatric evaluations before the Agency recommended a permanent plan. The social worker was working on scheduling a team decision meeting to discuss placement. A new adoption assessment was completed which concluded that termination of parental rights would be detrimental to the children because the current caretakers were unable or unwilling to adopt, and adoption would substantially interfere with the sibling relationship.

In an addendum report filed on July 3, the Agency changed its recommendation from PPLA to adoption with termination of parental rights, as the Agency had identified new prospective adoptive parents for the children. The couple was highly interested in, and able to provide, a permanent plan of adoption. The social worker stated that the first prospective adoptive couple was located in April, but that placement failed; the social worker noted that the children, especially Julissa and Dario, "have exhibited increase[d] behaviors of defiance. Their behaviors are placing their current placement at risk of removal." As of the writing of the report on June 29, physical contact between the children and prospective adoptive parents had not occurred, with the initial contact scheduled for July 3. The children and prospective adoptive parents had viewed photographs of each other and been provided with each other's personal information.

The social worker explained in the addendum report the sequence of events after the first prospective adoptive couple backed out of the adoption. On June 12, the Agency received a letter from Angelica and Julissa's therapist, Forsyth. Forsyth stated she was "unable to attend today" due to a previously scheduled training, but she wanted to share her concerns about the girls. Forsyth requested they not be moved from their current placement due to their mental health diagnoses, previous treatment progress and recently failed adoptive placement, which had been especially difficult on Angelica, who did not

want to leave her current placement, as well as on Julissa. In Forsyth's opinion, being in a stable and nurturing environment where attachment to a healthy adult could occur was more important than adoption or maintaining sibling relationships. Forsyth noted that the great-aunt had worked very hard to understand and incorporate RAD parenting interventions, and the girls were making slow and steady progress. Forsyth recommended that the Agency focus on the girls' individual needs when determining placement.

On June 14, a team decision meeting (TDM) was held regarding placement of the children. Mother, the current caretakers, the children's attorneys, and the "children's therapist" were all invited. Dario and Daniel's foster mother said she was willing and able to adopt Daniel, but not Dario, and she did not know how long she would be able to care for Dario due to his acting out. The great-aunt stated she would not be able to adopt Angelica, Julissa and Andrew, but said she would consider guardianship of the three. The social worker had informed both of the attending therapists of the children's behaviors; therapeutic behavior services (TBS) were going to be implemented in the upcoming weeks.

On June 20, the Agency received a call from a couple who was highly interested and motivated in adopting the five children together. They had gone through an assessment, their home study had been completed, and they were licensed to take five children. The children's current behaviors and needs had been disclosed to the couple. The prospective adoptive parents were "fully aware of the needs of the children" and were willing and able to adopt the sibling set.

On June 26, the social worker advised the children's attorneys of the current situation. The attorney for Dario and Daniel did not respond. The attorney for Angelica, Julissa and Andrew electronically advised the social worker on June 27 that she agreed with the children being together in the new prospective adoptive home. The great-aunt called the social worker on June 26 and expressed her concerns and frustrations. The day

18.

after the TDM, the maternal grandmother called the great-aunt and told her it was her fault the children had not been returned to mother, that mother's parental rights would not be terminated and mother could make decisions about the children. The maternal grandmother also said that once court was completed, she and mother would be able to visit and take the children at any time. The great-aunt was tired and frustrated with dealing with the family's behaviors, and was concerned that if she provided a permanent plan for the children, mother and grandmother would intervene constantly with the way she was raising the children.

The Agency deemed the children to be adoptable. The social worker reiterated the prospective adoptive parents were clear in their desire to adopt all five of the siblings together. The prospective adoptive parents, a retired couple in their mid-50's, had been married for 33 years and were parents to three adult children who do not live with them. They had always wanted a large family and felt this was the perfect time to expand their family through adoption. They were interested in adopting a sibling group because they felt strongly about not splitting children up from their siblings, and were looking forward to providing the support and experiences each child needed. An adoption assessment was completed which stated the children were adoptable.

In an addendum report filed on July 17, the social worker stated that the children were expected to be placed with the prospective adoptive parents within the next couple of weeks. The children and prospective adoptive parents had been together on three separate occasions. The interaction between the children and prospective adoptive parents appeared appropriate and the parents were attentive to the children's needs. On the first contact, which took place in an observation room, the parents brought various activities and crafts for the children. On the second contact, they all played at a local park and the parents brought a family picnic; the children appeared to enjoy the time together. The children and parents had also enjoyed swimming together; during swimming, Andrew, Julissa and Daniel sought the parents for support and reassurance

19.

while in the pool. The children appeared calm during visits, and asked their current caretakers, as well as the social worker, when they would see the prospective adoptive parents again.

On July 12, the social worker asked the children if they wanted to spend the night at the prospective adoptive parents' home; the children stated yes. On July 13, the children went for an extended visit; they were going to return on July 17, but the visit was extended to later in the week after Dario said he felt safe and wanted to stay a little longer. The social worker spoke with Dario by telephone on July 16 to see if he wanted to attend the court hearing; Dario declined, but told the social worker "to ask the court if we can stay here forever," referring to the prospective adoptive parents' home. The prospective adoptive parents do not live in Tulare County. When they came to Visalia to visit the children, they also "become educated with the needs of the children, by communicating with the service providers to the children." The prospective adoptive parents were "fully aware" of the children's needs and were clear in their desire to adopt the children.

The prospective adoptive parents attended REACH Tulare County, which provides pre- and post-adoption services to families adopting through Tulare County foster care. The REACH program supervisor reported she had observed a pre-adoptive visit between the parents and children. She also met with the parents on July 12 for two and a half hours, when she provided education on the psychological effects of adoption on children. She assessed the parents to have superior parenting skills, including the flexibility to meet the children's individual needs, an open communication style, and experience with large families and positive disciplinary measures. The parents also had an established support system prepared to nurture the family. While the parents did not have experience parenting children with histories of maltreatment, they appeared to be a warm and loving couple with solid parenting skills and a willingness to provide permanency. They were

20.

also invested in ongoing training and ready to access the adoption resources and support they would need to meet the needs of a large adopted sibling set.

The contested section 366.26 hearing was held on July 18. The Agency submitted on its reports and the juvenile court took judicial notice of the entire case file. The other parties also submitted on the reports. Mother's attorney argued that mother wanted to see the children remain in their current placements and the Agency pursue the placement of all the children with relatives, rather than with an unknown placement. The attorney for Angelica, Julissa and Andrew asserted that the sibling exception did not apply, as the children were to be placed with the prospective adoptive family within the next two weeks. County counsel confirmed that was the plan, as the children already had extended overnight visits, as well as a week-long visit, visits were going very well, and Dario had indicated he did not want to leave the prospective adoptive home. County counsel further explained that when the prospective adoptive parents had been in the area, they had taken time to learn about each child and his or her issues, and also had been set up with services, which are available to assist them if there were problems. The attorney for Dario and Daniel joined in the remarks of the other children's attorney and County counsel. The juvenile court took the matter under submission and set July 20 as the hearing date for the ruling.

On July 20, the juvenile court adopted the social worker's findings and orders. The juvenile court found there was clear and convincing evidence that the children were likely to be adopted, ordered termination of parental rights, and referred them to the county adoption agency for adoptive placement.

## DISCUSSION

21.

Mother's appeal challenges the termination of her parental rights on the ground the juvenile court's finding of adoptability is not supported by sufficient evidence.[5]  Both the evidentiary standard that applies to this issue in the juvenile court and our standard of review on appeal are well settled.  At a section 366.26 hearing, the court must determine by clear and convincing evidence whether it is likely the minor will be adopted. (§ 366.26, subd. (c)(1).)  If the court finds a likelihood of adoption, the court *must* terminate parental rights, in the absence of statutory exceptions that mother does not argue are applicable here.  (*In re Celine R.* (2003) 31 Cal.4th 45, 53 [if evidence at section 366.26 hearing shows child is likely to be adopted, juvenile court "must order adoption and its necessary consequence, termination of parental rights, unless one of the [statutorily] specified circumstances provides a compelling reason for finding that termination of parental rights would be detrimental to the child."]; *In re A.A.* (2008) 167 Cal.App.4th 1292, 1320 (*A.A.*).)

"Although a finding of adoptability must be supported by clear and convincing evidence, it is nevertheless a low threshold:  The court must merely determine that it is 'likely' that the child will be adopted within a reasonable time.  [Citations.]  We review that finding only to determine whether there is evidence, contested or uncontested, from which a reasonable court could reach that conclusion.  It is irrelevant that there may be evidence which would support a contrary conclusion."  (*In re K.B.* (2009) 173 Cal.App.4th 1275, 1292.)  In other words, on appeal, "the clear and convincing test

[5] In her reply brief, mother argues this court should strike the respondent's brief for failing to comply with California Rule of Court, rule 8.204, by presenting an "inaccurate, slanted account of the evidence in its statement of the case and facts, and in its argument fails nearly totally to cite to the record to support the statements of fact upon which its argument is based."  We decline the request, as mother has not filed a separate motion requesting such a sanction.  (Cal. Rules of Court, rules 8.54(a), 8.204(e)(2)(B); *SCC Acquisitions Inc. v. Central Pacific Bank* (2012) 207 Cal.App.4th 859, 863.)  In addition, we elect to forego our option to order the brief returned for correction or to strike the brief.  (Cal. Rules of Court, rule 8.204(e)(2)(C).)

disappears and 'the usual rule of conflicting evidence is applied, giving full effect to the respondent's evidence, however slight, and disregarding the appellant's evidence, however strong.'" (*In re I.W.* (2009) 180 Cal.App.4th 1517, 1526.) Moreover, we review the record in the light most favorable to the juvenile court's findings, and draw all inferences from the evidence that support the court's determination. (*In re Nada R.* (2001) 89 Cal.App.4th 1166, 1177.)

"The adoptability issue at a section 366.26 hearing focuses on the dependent child, e.g., whether his or her age, physical condition, and emotional state make it difficult to find a person willing to adopt." (*A.A., supra,* 167 Cal.App.4th at p. 1311.) "It is not necessary that the child already be in a potential adoptive home or that there be a proposed adoptive parent 'waiting in the wings.' [Citation.] [¶] Conversely, the existence of a prospective adoptive parent, who has expressed interest in adopting a dependent child, constitutes evidence that the child's age, physical condition, mental state, and other relevant factors are not likely to dissuade individuals from adopting the child. In other words, a prospective adoptive parent's willingness to adopt generally indicates the child is likely to be adopted within a reasonable time either by the prospective adoptive parent or by some other family." (*A.A., supra,* 167 Cal.App.4th at pp. 1311–1312.)

Having reviewed the record as summarized above, we conclude there was substantial evidence to support the juvenile court's adoptability finding. The children were physically healthy, with no developmental delays, and they are attractive. None of the children received services from CVRC. They were doing well in school. The children shared close relationships with each other. While Dario could be aggressive with his siblings, he was able to engage in appropriate behavior with them and the other children interacted appropriately with each other.

Although Angelica and Julissa had been diagnosed with an attachment disorder, and Dario and Daniel had been diagnosed with adjustment disorders, they all were

23.

receiving therapy. In spite of the girls' disorder, they had made significant psychological progress in their placement with the great-aunt, as well as important strides in their attachment potential. We recognize that their therapist was concerned about the effect another change of placement would have on their mental health; however, the therapist did not opine on what difficulties another family might have with the girls should a second adoptive placement be attempted. Notably, when Julissa was placed with the first adoptive family, she did not engage in any of the behaviors previously reported, such as throwing tantrums or having outbursts. Moreover, the first adoptive family did not have any concerns about the other children's behaviors, with the exception of Dario, who was having difficulty accepting the loss of his relationship with mother. But even Dario's behavior improved during visits with them.

Finally, two sets of caregivers had been interested in adopting the children. Although the first prospective adoptive parents had to back out of the adoption for personal reasons, namely a move to the east due to a career change, until that occurred they remained committed to adopting the children despite their behavioral problems. While the children had not yet been placed with the second prospective adoptive parents, the parents were apprised of the children's issues, had educated themselves on the services the children required and were fully aware of the children's needs. The children had participated in an extended visit with them and there were no reported problems. Significantly, the children were all excited to visit them and Dario wanted to be placed with them.

Given the children's positive attributes, the progress they were making in overcoming their behavioral and emotional problems, as well as the current and former caregivers' willingness to adopt them, the juvenile court properly could find it was likely the children would be adopted. (§ 366.26, subd. (c)(1).)

Mother claims that where a child has characteristics that make him or her less "adoptable," such as being seven-years-old or older, being part of a sibling group, having

physical or mental deficits, or having serious emotional/behavioral problems, there "generally" must be evidence of persons who, after becoming aware of those characteristics, intend to, or are interested in, adopting the child. Citing the cases which found children adoptable despite severe behavior problems, namely *In re I.I.* (2008) 168 Cal.App.4th 857, *A.A.*, *supra*, 167 Cal.App.4th 1292, and *In re Brandon T.* (2008) 164 Cal.App.4th 1400, she asserts that when dealing with children who have a "high level of 'difficult to adopt' characteristics," the evidence must establish more than that families are interested in adopting the children or that a family intends to adopt them after being advised of their characteristics. In such situations, she asserts there must be evidence that the prospective adoptive parents actually cared for the children in their home, so the juvenile court may be assured the children's characteristics will not cause them to back out.

Applying this "rule" to this case, mother argues that the children had most of the characteristics that make a child difficult to place for adoption, as two of the children are seven-years-old or older, and one is nearly seven; the children are a large sibling group of five who are closely bonded; and the children have "major psychological/emotional issues" that threaten their ability to form healthy parent-child bonds and become more behaviorally adjusted. Mother reasons that since the children are highly difficult to place for adoption, that two families were willing to adopt them is insufficient evidence to support the adoptability finding. She argues the failed adoptive placement demonstrates that the children are difficult to adopt, and actually exacerbated the children's attachment issues and needs, which led the Agency to recommend a PPLA and that the children receive psychiatric evaluations before changing placements. She further argues there was no guarantee the prospective adoptive parents would follow through with the adoption, as they had only recently been identified, did not have substantial experience caring for the children, it was unclear how much they had been told about the children's difficulties, and they had not yet developed a bond with the children. She contends the Agency's

change of recommendation from PPLA to adoption was irrational, as the only thing that had changed between the two recommendations was the appearance of the new prospective adoptive couple who, as of June 29, the date of the Agency's report, had not yet seen the children.

Notably, mother raised none of these concerns in the juvenile court where her points and their legal significance, if any, could have been litigated. By arguing them now, mother essentially asks this court to reweigh the evidence and draw questionable inferences on conflicting evidence. This, however, is not within our appellate purview. Our power, when asked to assess the sufficiency of the evidence, whether or not contradicted, which will support the trier of fact's conclusion. All conflicts must be resolved in respondent's favor and all legitimate inferences indulged in to uphold the decision, if possible. (*In re Brison C.* (2000) 81 Cal.App.4th 1373, 1378-1379.) On this record, we conclude there was substantial evidence to support the juvenile court's finding.

Moreover, mother's argument centers on the children's behaviors, which she believes are so egregious that they likely would cause the second prospective adoptive family to back out of the adoption. The children's behaviors, however, are not as bad as she portrays. As discussed above, while Angelica and Julissa had been diagnosed with attachment disorders, they did not demonstrate any significant behavioral problems with the first prospective adoptive couple, and there was no evidence of behavioral problems with the second prospective adoptive couple. The girls' therapist was concerned about the effect a change in placement would have on them and commended the great-aunt for applying RAD parenting techniques, but did not opine on what behavioral difficulties the girls might experience if another adoptive placement were attempted. While mother emphasizes the therapist's recommendation to leave the girls with the great-aunt, she ignores that the great-aunt was reconsidering providing a permanent plan for them, since mother and her family were threatening to interfere. There were absolutely no problems

26.

reported with Daniel's behavior. And while Dario was having the most problems adjusting to the idea of being adopted, and his foster parents were unwilling to adopt him because of problems he was displaying in their home, his behavior apparently improved when visits with the second prospective adoptive couple began. Viewing the evidence in the light most favorable to the juvenile court's decision, the juvenile court reasonably could find that the children's behaviors were not so severe as to require the court to question whether the second couple would back out of the adoption.

Mother asserts the first adoptive family backed out in part because of the children's behaviors. Reading the record in a light most favorable to the juvenile court's findings, as we must, we conclude there is no evidence the children's behaviors influenced their decision to back out. Mother cites to a section 366.26 report, in which the social worker stated the prospective adoptive parents intended to adopt the children, and to the May reports from Dario's and Daniel's therapist. She then points to the CASA report, which states that the foster mother told the CASA "they might not be able to provide permanency after all, the foster mother stated her husband will be going through a career change. The foster parents reported they were in the process of informing the county social worker about the latest information. On 05-30-2012, CASA contacted the social worker but she was out, so this information was given to the supervisor Kathleen Trevino. The foster parents['] major concern is in regards to Dario who has demonstrated to be aggressive and upset due to not being able to go back home. The four oldest children receive counseling, and are demonstrating better behavior at the home." She also cites to the social worker's addendum report, which states that the social worker "was informed that the prospective adoptive parents to the children would not be able to continue with the adoption process, for personal issues aro[]se in which they will be moving back east. The prospective adoptive parents stated that they are devastated on the current situation, however would not be able to adopt the children."

27.

In our view, this evidence shows that the first family backed out because they were moving back east, not because of the children's behaviors. In fact, they reported that the children's behaviors were improving and Julissa did not act out as reported to them. While they were concerned about Dario, that they expressed this concern does not mean that they backed out because of his behavior. In fact, they reported an ability to discuss Dario's problems with him, and after that discussion, he had an enjoyable weekend with his siblings. That the children were labeled "difficult to place" does not mean that the first couple was not nevertheless committed to adopting them.

Mother would like us to adopt a rule that requires the children, who have been found to be difficult to place, to have been living with the second prospective adoptive couple for an extended period of time before an adoptability finding may be made. We decline to do so. None of the cases she cites require such a finding. Moreover, as we explained in *In re G.M.* (2010) 181 Cal.App.4th 552, 562, not all dependency cases fall neatly into one of two scenarios: One, in which the availability of a prospective adoptive parent is not a factor whatsoever in a social worker's assessment that a child is like to be adopted (generally adoptable); or two, where a child is likely to be adopted based solely on the existence of a prospective adoptive parent (specifically adoptable). "These scenarios represent opposite ends on the continuum of when a child is likely to be adopted. However, many adoption assessments that recommend an adoptability finding fall somewhere in the middle. They consist of a combination of factors warranting an adoptability finding, including, as in this case, the availability of a prospective adoptive parent. This is the reality we confront, notwithstanding appellate arguments that assume a child is either generally adoptable without regard to a prospective adoptive parent or specifically adoptable based solely on the availability of a prospective adoptive parent." (*Id.* at p. 562.)

Here, as we have already explained, there was a combination of factors which supported the juvenile court's adoptability finding.  For all the reasons stated above, we conclude the juvenile court properly could find it likely the children would be adopted.

## **<u>DISPOSITION</u>**

The order terminating parental rights is affirmed.